UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

|  |  |
|---|---|
| In re:<br><br>MODERN SHOE COMPANY LLC,<br><br>Debtors.[1] | Chapter 11<br>Case No.<br><br>Joint Administration Requested |

## DECLARATION OF KIMBERLY BRADLEY

Kimberly Bradley states as follows:

1.  I am the President, Treasurer, Secretary, Chief Financial Officer, Chief Operating Officer, and a Manager of Modern Shoe Company LLC, and the Treasurer, Secretary, Chief Financial Officer, Chief Operating Officer and a Manager of Highline United LLC, the above-captioned debtors and debtors-in-possession ("Modern Shoe" and "Highline," or the "Debtors"). In these capacities, I am familiar with the Debtors' day-to-day operations, business and financial matters.

2.  I was hired by the Debtors in August 2014 as group CFO. In November 2015, I also became group COO. Prior to working for the Debtors, I worked in the consumer packaged goods industry (i.e., cosmetics, alcoholic beverages, food), including as a CFO, for approximately 20 years. I hold an MBA from Bentley University.

3.  Except as otherwise indicated, all statements in this Affidavit are based upon (a) my knowledge as Manager and an officer of the Debtors; (b) my review of relevant

---

[1] The debtors in the chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: Modern Shoe Company LLC (0193) and Highline United LLC (5860).

1

documents, including the Debtors' books and records; (c) information supplied to me by other members of the Debtors' management and employees; and (d) my opinion based on my experience and knowledge of the Debtors' operations and financial affairs.

4. As an officer and a member of the board of managers of the Debtors, I participated in the decision to cause the Debtors to file a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on May 2, 2016 (the "Petition Date")

5. I have reviewed the Debtors' voluntary petitions, schedules, and all of the initial pleadings filed or that will be filed in the first two weeks following the Petition Date (the "Initial Pleadings. The Initial Pleadings seek, among other things, to ensure the continuation of the Debtors' business operations without interruption, and maintain the support and confidence of the Debtors' employees, suppliers and customers, all of which will be critical to the Debtors' reorganization and sale efforts.

I. **HISTORY OF THE DEBTORS**

6. Modern Shoe and Highline are each a Delaware limited liability company with a principal place of business in Hyde Park, Massachusetts. Modern Shoe was founded in 2005 and began conducting business in 2006. Highline was founded in 2008. Both companies are specialty designers, wholesalers, and importers of premium-segment footwear and handbags. Both companies design and import shoes under various licenses (which are described below) and under a private label. Although the companies operate with shared executive, finance and administrative staff, and occupy the same space, separate books and records are maintained for each Debtor, with an allocation of shared overhead.

7. The Debtors lease their Hyde Park headquarters, which is composed of approximately 18,000 square feet. That lease expires at the end of 2019. In addition to their

2

headquarters, the Debtors lease a showroom and sales offices in New York City, which includes three floors. The showroom is composed of two floors with room to display each brand of shoes sold by the Debtors. The third floor houses a design studio and sales offices. The offices include two cubes, four small offices, a bathroom and a kitchen. The lease for this space expires at the end of 2018.

8.     Modern Shoe was originally founded by individual investors and a company called Grandview International Ltd. ("Grandview"). In 2009, Grandview acquired the interests of the individual investors and Modern Shoe became a wholly-owned subsidiary of Grandview. Grandview has also wholly-owned Highline since Highline's inception. Grandview is a holding company. In addition to the Debtors, Grandview owns 100% of the interests of two affiliated companies – ASH Footwear International LLC and JMC Footwear LLC – both of which were closed in 2015 and dissolved in early 2016. Grandview itself is owned by a holding company known as Highline United Holdings USA, Inc. ("HUH USA"). I am the COO and a director of HUH USA.

The Debtors' Business

9.     As described above, the Debtors are specialty designers, wholesalers, and importers of premium-segment footwear. The Debtors currently employ six designers, who design footwear for each season. The Debtors provide the design specifications, including style, color, and material, to third party manufacturers. The footwear is manufactured overseas, primarily in China, by JS Macao International, Universal Max and Ash (HK) Limited (the "Affiliate Manufacturers"), which companies share some common ownership with the Debtors' ultimate ownership. The Debtors also previously manufactured handbags, but discontinued that business in November 2015. The Debtors transferred certain trademark licenses that they held

3

for handbags to a company known as Bag Studio LLC. HUH USA also still holds a license from Ash (HK) Limited to design and distribute handbags.

10. After manufacture, the products sold by the Debtors are shipped to the United States for eventual distribution and sale. The products typically are sent from the manufacturer in China to a port in Hong Kong. From Hong Kong, the Debtors use logistics management and shipping companies to arrange for the transport of the products to warehouses in the United States and eventual distribution to the Debtors' customers. The Debtors use freight forwarders, including Maersk Logistics and Everglory Logistics, Inc., to arrange for such transport (collectively, the "Freight Forwarders"). Among other things, the Freight Forwarders find an available carrier, schedule transport of the products to the United States, pay freight costs on behalf of the Debtors, ensure that the products are permitted entry into the United States, and pay any required customs duties. The Debtors then reimburse the Freight Forwarders for those costs.

11. Once the goods arrive in the United States, they are shipped to and stored at third party warehouses for eventual distribution to the Debtors' customers. The Debtors' primary warehouse is located in San Pedro, California, and managed by Toll Global Forwarding SCS (USA), Inc. ("Toll"). Most products leave the warehouse within two-to-four weeks, and are shipped directly to customers using domestic freight carriers such as UPS.

12. The Debtors' customers comprise some of the largest and best known apparel and footwear retailers in the United States. Customers for the Debtors' licensed products include Macy's, Bloomingdales, Lord and Taylor, Saks Fifth Avenue, DSW, Inc., The TJX Companies, Inc., and Amazon. Customers for the Debtors' private label products include Neiman Marcus, QVC and Saks Fifth Avenue. The Debtors also sell their goods directly through a website. The

Debtors' website – http://www.ashusa.com – and its website sales are managed by a third party known as Pasadena Services, Inc.

13. The methods by which retailers purchase products from the Debtors varies, but a majority of retailers purchase good seasonally, four times each year. At the beginning of each selling season, representatives from the retailers make appointments to visit the Debtors' showroom in New York to view the Debtors' line of products for the upcoming season. This is followed by a second meeting at which the retailers inform the Debtors which styles they like for the upcoming season and request pricing, after which purchase orders are issued.

14. Some of the Debtors' larger retail customers require that the Debtors guarantee certain margins on sales to take into account markdowns and sales adjustments that these retailers make when selling the Debtors' products through the course of a season. Each such retailer also provides its target sales and margin expectations for the upcoming season. At the end of each season, a sales representative from the Debtors and from each of the retailers negotiate a settlement amount if the Debtors' products do not meet sales expectations. If the Debtors do not agree to pricing concessions in the form of markdowns so that the retailers can meet these margin expectations, it is difficult to get product into the next season or at the same purchase level for a retailer's "open to buy," or the retailer may opt out of carrying the product line going forward.

Trademark Licenses

15. The Debtors hold several trademark licenses through which they sell branded lines of footwear. The licensors include Brand Matter LLC ("Brand Matter"), which owns the Ellen Tracy mark ("Ellen Tracy"), Elie Tahari, Ltd., which owns the Elie Tahari and Tahari marks (collectively, "Elie Tahari"), French Connection Limited ("French Connection"), and Ash

5

(HK) Limited ("Ash Shoes, Handbags, and Ready to Wear") (collectively, the "Licensors"). Through these licenses, the Debtors have the right to use the trademarks to design their footwear and other products, subject to the Licensors' right to approve of such designs and where the footwear is sold. Modern Shoe is the licensee on the French Connection and Ellen Tracy licenses, and Highline is the licensee on the Elie Tahari and Ash Shoes, Handbags, and Ready to Wear licenses. Modern Shoe was originally the licensee on the Elie Tahari license, and it was assigned to Highline United on January 1, 2016.

16. Modern Shoe entered into the license agreement with Elie Tahari in or around September 2005, and the Ellen Tracy license followed in or around May 2007. At the outset, these license arrangements were successful in generating revenue for the Debtors. The Debtors expanded from designing and selling exclusively footwear and began also selling handbags. As recently as 2013, the Debtors had approximately $90 million in sales, with the Elie Tahari license accounting for approximately $35-$40 million of the total and the Ellen Tracy license accounting for approximately $15 million in sales.

17. The Ellen Tracy and French Connection license agreements include certain guaranteed minimum royalty payments (the "Guaranteed Minimum Royalties"). The Elie Tahari license also included such a guarantee, but, as explained below, a recent amendment to the license agreement eliminated the Guaranteed Minimum Royalties. These licenses require the Debtors to pay certain minimum royalties to the Licensors regardless of the sales made using the licensed trademarks. When the Debtors initially entered into the License Agreements, they generated enough sales to pay the Guaranteed Minimum Royalties. However, the Licensors have insisted upon and obtained higher Guaranteed Minimum Royalties in subsequent license agreement amendments. The Debtors have been unable to generate enough revenue to keep up

with the increasing Guaranteed Minimum Royalties, which is one the factors that has caused the Debtors to file Chapter 11.

18. Due to the increasing Guaranteed Minimum Royalties and the decline of the Ellen Tracy brand, the Debtors and Brand Matter agreed that the Guaranteed Minimum Royalties for 2015 would be spread out and paid over two years in 2015 and 2016. The Debtors made such payments in accordance with this agreement. Despite this agreement, on November 18, 2015, Sequential Brands Group, Inc. ("Sequential"), which purchased Brand Matter, sent correspondence to the Debtors threatening to terminate the Ellen Tracy license because of allegedly unpaid Guaranteed Minimum Royalties, and on February 23, 2016, Sequential purported to terminate the Ellen Tracy license agreement. The Debtors have disputed Sequential's claim of breach and right to terminate the license agreement. Since that time, on or about April 21, 2016, Brand Matter filed suit against Modern Shoe for the alleged failure to make the Guaranteed Minimum Royalty payment due under the Ellen Tracy licensing agreement.

19. On April 22, 2016, the Debtors signed an amended Elie Tahari license agreement, which was more economically feasible for the Debtors. In particular, the amendment decreased the royalty payments that the Debtors are obligated to make to Elie Tahari and eliminated Guaranteed Minimum Royalties, guaranteed minimum sales provisions and the Debtors' obligation to make minimum advertising expenditures.

The Debtors Decide to Commence Voluntary Chapter 11 Proceedings

20. The Debtors engaged in substantial efforts to renegotiate these licenses and avoid a bankruptcy filing, but these efforts proved unsuccessful. By April 2016, it became clear that

the certain of the Licenses were not likely to ever be economic for the Debtors under the current Guaranteed Minimum Royalties.

21. While the Guaranteed Minimum Royalties are the primary cause of the Debtors' bankruptcy filing, the Debtors have experienced other financial problems. Unlike Modern Shoe, Highline United was not profitable from the outset. In addition, the Debtors' expansion into designing and selling handbags was not profitable. Further, two of the Debtors' largest customers – Macy's and Lord and Taylor – ceased selling Ellen Tracy branded apparel. Although the Debtors do not sell apparel, as a result of the discontinuation of the Ellen Tracy apparel line, Macy's and Lord and Taylor also discontinued the Ellen Tracy line of footwear sold by the Debtors. In addition, the Ellen Tracy brand began to decline more broadly because of its lack of department store presence, erasing one of the Debtors' largest revenue streams.

22. As a result of the Debtors' financial troubles, its lender, Santander Bank, reduced their line of credit from $10 million to $2 million in the Fall of 2014 and then revoked the line of credit in July 2015. In order to stave off bankruptcy at that time, the Debtors' equity investors made an $8 million investment. In addition, the Affiliate Manufacturers began extending more generous credit terms to the Debtors to improve their cash flow.

23. In late 2015 and early 2016, it became clear that the Debtors would need to make more significant operational changes as they were saddled with a number of uneconomic licenses. The Affiliate Manufacturers' debt has increased substantially and they are unable to continue to support the Debtors' operations, and the Debtors need to refocus their business on core brands in improving overall profitability. The Debtors' current owners were willing to consider revitalizing the Debtors, but not under the current capital structure, and insisted that the Debtors seek protection under Chapter 11 of the Bankruptcy Code. The owners have created a

new company – Bright Star Ventures LLC (the "Buyer") – which has made an offer to acquire substantially all of the Debtors assets and assignment of certain of the Licenses and to provide short term liquidity during a bankruptcy case. To this end, the Debtors are negotiating an asset purchase agreement (the "APA") with the Buyer to sell their businesses to Buyer, and pursuant to which the Debtors are commencing these Chapter 11 proceedings and will be seeking authority to sell their assets pursuant to Sections 363 and 365 of the Bankruptcy Code. The Debtors have also negotiated the terms of debtor-in-possession financing from the Buyer, discussed more fully below.

The Debtors Secured and Unsecured Indebtedness

24. As of the Petition Date, the Debtors have no secured indebtedness. The Debtors have leased office equipment and leased vehicles that could give rise to secured claims if the Debtors were to no longer perform under those leases. The total amount of those claims is approximately $25,000 and is limited to specific collateral.

25. I am aware of creditors that have asserted or may assert priority unsecured claims in the aggregate amount of no more than approximately $10,000, comprised of pre-petition sales and use taxes owed to certain state taxing authorities. As explained below, the Debtors have paid the most recent payroll to their employees.

26. As of the Petition Date, the Debtors have trade debt and other unsecured claims of approximately $28,239,920.50. The Debtors' largest unsecured creditor is J.S. Macao, one of the Affiliated Manufacturers, which is owed $22,695,624.72.

II. THE INITIAL MOTIONS

    A.     **The Sale Motion**

27. The Debtors and the Buyer are currently negotiating the APA, and the Debtors intend to file soon after the Petition Date a motion to approve bidding procedures and authorize

the transactions subject of the APA. The Debtors believe that the best way to preserve the value of their assets for creditors and shareholders, and maintain their businesses, is to market and sell substantially all of their assets.

28. The Debtors intend to request a period of approximately two months to solicit further offers. The Debtors have hired an experienced Chief Restructuring Officer, Bruce A. Erickson and his firm BErickson Group LLC to assist the Debtors in marketing their assets and soliciting additional offers. The Debtors seek a sale because given the Debtors' financial position, they cannot afford to linger long in Chapter 11.

### B.    DIP Financing Motion

29. The Debtors will also file a motion to obtain financing to fund their operations between the Petition Date and the closing of the sale of substantially all of their assets (the "DIP Financing Motion"). During this time, it is critical for the Debtors to maintain business operations to ensure they obtain the maximum value for their assets in any sale. The Debtors anticipate that they will have sufficient liquidity to fund their operations for an additional 30-to-45 days. Nevertheless, the Debtors will require approximately $2 million in financing after that time until the closing on a sale. The Debtors also do not know whether vendors will continue to provide open credit, or will impose more restrictive terms.

30. As described, the Debtors' business is dependent upon many large retailers such as Lord and Taylor, Bloomingdales and Amazon. In addition to funding the Debtors' operations to provide liquidity for an asset sale, the DIP Facility will also reassure these critical customers that the Debtors will be able to continue normal operations throughout the pendency of the bankruptcy. Maintaining relationships with these customers is critical to the viability of the Debtors' business going forward and to moving forward with a successful sale.

31. Given the Debtors' financial condition, they believe that they would be unable to obtain financing on terms more favorable than those offered under the terms of the DIP financing agreement. The Debtors are not aware of any lender who provides unsecured debtor-in-possession lending allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unaware of any secured credit available on equal or more favorable terms than those offered under the DIP Facility. A credit facility in the amount and under the terms provided under the DIP Facility is not available without the Debtors granting a secured claim on its assets and a superpriority administrative claim.

32. While the lender under the DIP Facility is a related entity to the Debtors, sharing some common ownership with the ultimate ownership of the Debtors. each side was represented by independent counsel in these negotiations. The Debtors' CRO also assisted the Debtors in negotiating the DIP Credit Agreement and formulating the budget.

**C.     Wage and Cash Management Motions**

33. Although the Debtors intend to operate for only a short period of time, it is necessary to maintain operations in a manner that will preserve and maximize value. The Debtors' Motion for an Order Approving the Debtor's Use of Existing Bank Accounts, Business Forms and Checks (the "Cash Management Motion") and Motion for Authorization to Pay Priority Pre-Petition Wages and Salaries (the "Wage Motion") are intended to allow the Debtors to operate during the Chapter 11 proceeding as close to "business as usual" as possible.

34. Highline currently has 25 employees and Modern Shoe currently has 14 employees (collectively, the "Employees"). The Debtors expect that current employee levels will remain substantially the same during the Chapter 11 proceedings at least through the approval and closing of the contemplated sale.

35. The Debtor's Employees are paid semi-monthly in arrears on the 15th and last day of the month. The Employees receive all of their compensation, comprising wages, salaries, overtime wages, and withholding taxes, but not including their regular 401(k) contributions and employee benefits (collectively, "Compensation"), through ADP, which is a payroll administrator engaged by the Debtors to help manage their payroll. The Debtors transfer funds to ADP in advance of each payroll in an amount sufficient to fund the Employees' Compensation, including, among other things, any employee tax withholding and employer tax contributions. The Debtors' most recent payroll was made by ADP on April 29, 2016, for the second half of April, 2016 (the "April 29 Payroll"). On or about April 28, 2016, the Debtors wired approximately $199,382 to ADP for payment by ADP to the Employees of the April 29 Payroll.

36. The Debtors self-administer all other benefits, including health, dental and life insurance, long and short term disability and payment of health insurance deductibles. The Debtors withhold the Employees' share of health and dental insurance once each month and pay the premiums to Blue Cross Blue Shield of Massachusetts and Delta Dental, respectively, one month in advance. The Debtors also make payments directly to Unum for long and short term disability and life insurance. The Debtors made all payments for April benefits prior to the Petition Date with the exception of payments to Unum.

37. The Debtors also maintain a 401(k) plan for the benefit of qualified and participating employees, make a safe-harbor contribution for all non-highly compensated employees that is equivalent to three percent of their earnings, and make a discretionary contribution for highly compensated employees. The Debtors self-administer the Employees'

12

401(k) contributions. In 2015, the Debtors contributed approximately $101,000 to Employees 401(k) plans.

38. The Debtors' next payroll will be on May 13, 2016, for the first half of May 2016 (the "May 13 Payroll"). Because the Petition Date falls on the first business day of the pay period, the May 13 Payroll does not include any pre-petition compensation.

39. While the Debtors do not believe that the May 13 Payroll will include any pre-petition compensation, they still seek the Court's approval out of an abundance of caution to ensure the continuation of their operations with the support of its remaining employees who are necessary to preserving any going-concern value of the Company. Absent such vital support, damage to the Debtors' operations would be immediate and irreparable. In addition, employees may be owed expense reimbursements for pre-petition obligations.

40. Modern Shoe and Highline each have one operating account and one lock box for the receipt of customer payments at Santander Bank (collectively, the "Bank Accounts"). The Bank Accounts are used in connection with the Debtors' business operations, and will be necessary during the Chapter 11 proceedings.

41. For the period April 1, 2016 until the Petition Date, the Debtors wrote only approximately 104 checks. The Debtors will informed their contact at Santander Bank of the filing of the bankruptcy petition.

42. In the Cash Management Motion, the Debtors request authority to maintain their existing accounts at Santander Bank. This relief will reduce administrative costs and expenses, and protect liquidity. It will relieve the Debtors' workforce from the cumbersome and time consuming process of closing their bank accounts, opening new accounts, and changing their business forms. Moreover, the Debtors will likely only remain as operating entities for about

three months, prior to the closing on the sale of their assets. It is particularly important for the Debtors' remaining employees to focus on preserving customer relationships, maintaining going concern value, soliciting bidders and, hopefully, responding to inquiries from other prospective bidders during the anticipated 60-90 days they will continue Chapter 11 operations.

43. Further, the Debtors have legitimate concerns that a change in their bank accounts could have a significant negative affect on their cash flow, particularly in the early days of the Chapter 11 case. The Debtors' customers make all payments directly to the Bank Accounts. Many of these customers are large retailers that have previously set up in their own systems the payment processes for the Debtors, including the accounts to which payment should be sent. It is a time-consuming and cumbersome process to cause these retailers to change the account to which they send payments. In fact, in my experience, even when customers are directed to change payment accounts, they will often fail to do so. Accordingly, if the Debtors are compelled to change the accounts provided to their customers, there is a real risk that current and future receivables are sent to the old accounts, and do not reach the Debtors for some time. Moreover, obtaining the necessary approvals for customers to change the accounts to which they make payment will be time consuming, further delaying the receipt of payments from customers.

D. **Shipping and Warehousing Charges**

44. Also in an attempt to maintain operations in a manner that will preserve and maximize value, the Debtors have filed a motion authorizing, but not directing, the Debtors to pay (i) prepetition shipping and delivery charges, and (ii) certain prepetition import obligations (the "Shipping and Warehousing Motion"). As set forth above, the Debtors' products are manufactured in Asia and then must be shipped to the United States and stored in warehouses for eventual sale to the Debtors' customers. It is critically important to the Debtors' business operations during the interim period between the Petition Date and the approval of the Sale

14

Motion that the Debtors' business continue uninterrupted. If the Debtors are unable to pay the amounts owed to the entities that arrange for the transport and storage of the Debtors' goods, there is a substantial risk that these companies will cease doing business with the Debtors' post-petition, or will hold inventory until they receive payments. Because the Debtors carefully manage their sales cycles, and given the seasonality of the Debtors' sales, any delay in receiving goods would have a disastrous effect on the Debtors' business operations because the Debtors would not be able to continue making sales to their customers and could lose the ability to sell for an entire season.

45. In connection with the importation of goods, the Debtors are required to pay various import/export charges, including, but not limited to, customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding or consolidation charges and other similar obligations ("Import/Export Charges"). Due to the complexity of United States customs laws and regulations, it is customary for importers to use the services of professional customs brokers and freight forwarders as agents (collectively, the "Customs Brokers").

46. The Debtors uses the services of certain Customs Brokers, to facilitate the actions that are required to import and export goods. In most cases, the import/export authorities present invoices to a Customs Broker, which pay such invoices. The Customs Broker then presents an invoice to and is reimbursed by the Debtors.

47. Payment of the Import/Export Charges is critical to ensure the uninterrupted flow of imported goods for sale. Absent such payment, parties to whom Import/Export Charges are owed may have the ability to hold or delay the delivery of such goods to the Debtors. If the flow of these goods were to be interrupted, the Debtors would be deprived of products needed for sale to their existing customers. The value of these products are worth far more to the Debtors (both

in terms of future receipts and the maintenance of valuable good will) than the aggregate amount of incurred, but unpaid, Import/Export Charges. Further, absent prompt payment, the United States Bureau of Customs and Border Protection may implement various sanctions against the Debtors, including fees, forfeiture, or denial of importing privileges. While the Debtors are not aware of any outstanding Import/Export Charges as of the Petition Date, the Debtors are requesting the Court's permission to pay such obligations in the ordinary course as they come due.

### E. Motion to Pay Taxes

48. The Debtors have also filed a motion authorizing, but not directing, the Debtors to pay certain sales and use taxes (collectively, the "Taxes") to various governmental authorities in the United States (the "Taxing Authorities"). Specifically, the Debtors pay sales and use tax on product samples in New York and sales tax in California and Massachusetts.

49. In the ordinary course of business, the Debtors collect and/or incur Taxes. The Debtors pay the Taxes on a monthly or quarterly to the Taxing Authorities in accordance with applicable laws and regulations. The Debtors estimate that the total amount of prepetition Taxes owing to the various Taxing Authorities will not exceed approximately $10,000.

50. The payment of these prepetition Taxes will eliminate unnecessary penalties and business expenses, forestall potential actions against the Debtors' managers and officers and preserve the Debtors' enterprise value.

## III. CONCLUSION

51. For the reasons set forth above and in each of the Initial Pleadings, and based on all available information of which I am aware, I believe that the relief sought in the Initial Pleadings is in the best interests of the Debtors, their creditors and estates; and therefore, on behalf of the Debtors, I respectfully request that the Initial Pleadings be granted.

Pursuant to 28 U.S.C. § 1746, I declare this 1st day of May, 2016, under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

                                                          */s/ Kimberly Bradley*
                                                        Kimberly Bradley
                                                        President, Chief Financial Officer, Chief
                                                        Operating Officer, Treasurer and Secretary,
                                                        Modern Shoe Company LLC
                                                        Chief Financial Officer, Chief Operating
                                                        Officer, Treasurer and Secretary, Highline
                                                        United, LLC